to the second case of the day, United States v. Henricks. Mr. Gorky. May it please the court, the clerk's notice where I signed in said that I had no time for a rebuttal and I would like to leave five minutes for a rebuttal if I could. All right, so you have ten minutes for your opening comment. Thank you, Your Honor. This is our second tour together. We had a prior decision of this court. In that decision, the Seventh Circuit set out that the district court judgments was vacated for determination of the party's property interests as of January 10, 2014, and then determine what property is subject to the government's restitution order. The court, in reaching that final conclusion, correctly noted that we look at Wisconsin law to determine what are the rights to property, and it also noted that we have marital property. And then in a tort situation, which is certainly the case here where the criminal defendant was accused of an insurance fraud scheme that disadvantaged insurance companies to the tune of $1.3 million, that's certainly a tort, and the collections are limited. So Wisconsin marital property law. We've got basically everything acquired during the marriage except by gift or inheritance and then things brought to the marriage. Everything is marital property. Marital property is owned 50-50. It's an undivided half interest in each item of marital property. So there were basically four types of property here. Number one was the equipment that was in custom collision. That was the criminal defendant's business that was shut down by the FBI in the middle of 2013. Certainly we have no question that that equipment is not part of any marital interest. That was the entity that wound up owing CoVantage Credit Union significant amounts of money when it closed. So that's not on the table. With respect to the retirement assets, the 50-50 distribution is what Judge Crabb came up with. I have a dispute with that only if, for some reason, there is an unequal distribution based on who earned what in terms of income tax refunds. Now we get to the income tax refund. This is the first item of major contention that we brought up before the court. Again, Wisconsin is a marital property state. Income is income. Even if it's ill-gotten income, it is still income under marital property. In fact, Wisconsin law says that embezzlement income is income and needs to be taxed. If there is income, and obviously this jet was shut down in the middle of 2013. Any money that he earned after that date was not from the business that conducted the criminal enterprise. That income is 50-50. Just as in a case where you have an earner's spouse and a homemaker's spouse. The homemaker's spouse is entitled to 50% of that under Wisconsin law. It's part of what marital property did when Wisconsin changed from common law to marital property. So income is income 50-50. Income tax refunds, therefore, are 50-50 as between the parties. Now, the district court determined it was in complete agreement with this analysis up until it got to the portion of its decision where it says, well, defendant's wages were not earned legitimately. We never had an evidentiary hearing on that. There's no finding. Certainly there's some hearsay that's out there, but defendant's wages were not earned legitimately. After the date that his business was shut down by the FBI, what else could it be? Because he was no longer conducting this criminal enterprise. So the tax refunds are a 50-50 proposition. Then we have A.J.'s autobody. Now, custom collision was a completely different entity. Judge Crabb indicates in page forward decision that the defendant relocated his business. That's not what happened in this case. The business location that A.J.'s was in was obtained with 100% financing from a bank. The frame rack that it has was obtained with financing from the frame rack manufacturer. The paint booth comes from the paint company with the promise that you keep buying their paint at their exorbitant prices in order to have that paint booth in your property. This is not a continuation of the criminal defendant's business. This was one that was created anew. And then again under Wisconsin law, you look at what property interests. I mean, that was the mandate. What did the parties own as of January of 2014 when the charge was brought? And the answer is this entity, this A.J.'s, was created during the marriage with financing, so each of them would have owned at that time a one-half interest in the shares, in the membership interest of A.J.'s autobody. That's what was the property interest on that date. But the district court said, nope, that business was created with fraudulent funds. Well, let's assume that it was. Let's assume that they stole equipment that was CoVantage Credit Union's collateral, that they defrauded the International Bank of Amherst, which provided the funding to buy the business. At best, that would create a constructive trust or constructive lien in favor of those two financial institutions. It doesn't do anything to create a bigger fund with which the criminal defendant could pay his criminal restitution. So the argument that this is just all dirty money that came into creating A.J.'s autobody I think is fallacious. Was Catherine just completely separate from this business? Excuse me, Catherine. Catherine created this business, but she doesn't run it. Her son Austin is the main person. At the time it was created, he was a minor, and it was created because she wanted him to have this last little time with his dad learning the ropes, and subsequent to that point they hired a manager that managed the business. So she's not a wrench turner. So marital property, we've got a 50-50 interest. But the district court's decision says that 100% of A.J.'s is available to satisfy restitution orders. I have trouble grasping how Jack Hendricks has an interest that the government can glom onto in order to recognize on its lien if Catherine Hendricks has none. If there were these criminal activities, the crime isn't the crime for which he was charged. It's her allegation with this hearsay documentation that these assets were acquired by defrauding others. And even if that were true, that these assets were acquired by defrauding others, the remedy is to the defrauded people, which is not the insurance companies that had been taken by the criminal defendant's scheme. And with permission, if there's no questions right now, I'll reserve the rest of my time. All right. Thank you, Scottie. Ms. Leering. Good morning. My name is Heidi Leering, and I represent the United States in this matter, and I represented the United States below. May it please the court, the district court correctly implemented this court's remand order and correctly concluded that appellant does not have a property interest in A.J.'s auto body in the 2013 income tax refund of defendant's wages under Wisconsin law. Appellant never provided any credible evidence to refute the United States' evidence that A.J.'s was established through defendant's fraud, through the custom collision assets, and through the misrepresentation to the bank, International Bank of Amherst. There's no question in the evidence that the United States provided that he was able to earn wages because of his fraud. The business was purchased in June of 2007. His crime scheme started in May of 2007 and continued until he was arrested. The Henricks signed an estoppel affidavit with CoVantage Bank in October, right after he was arrested and pled, that said they could no longer service the loans. They were in default for over $2.2 million of business loans, and that was just one financial institution that they owed money to. This business would have shut down years before. It was not successful but for his stealing that money, and he didn't even steal enough of it to really sustain it. Then they took the assets like the vehicles, the bank account, and transferred that over to A.J.'s. The frame rack and other equipment that Appellant's counsel just mentioned, those were assets of custom collision. What she did was she went and Catherine Henricks refinanced that with the institutions that owned that property. What the district court did correctly was conclude that this business, A.J.'s, could not exist but for the seed money from custom collision and the defendant's fraud. She has never presented any evidence financially showing that there was any other source of money. It would be almost impossible to refute the bank records or her discussions with the bank and things like that. We are at a loss as to what evidence there would be that she somehow earned an interest under the Wisconsin statutes. You need to earn or accrue a legal and equitable interest. Under the Wisconsin statutes, for example, when they look at tracing marital property when couples get divorced, they look at has money been exchanged, has something of value been exchanged. Nothing was exchanged here. It was stolen, and the victim should be entitled to get their money back. When you say stolen, was it because they took assets that were already encumbered and got additional loans on them? Yes, they were encumbered actually multiple times. In addition, he was not charged for this, but those assets were pledged as collateral at several different banks for several different loans. So when they went to the International Bank at Amherst and presented, it's in the exhibits, an asset list that said, we own this inventory free and clear. Can we get this loan to buy AJ's? It was only after the loan was granted that the president of International Bank of Amherst, and this letter is in the record as well, Butch Pomeroy wrote them and said, hey, you misrepresented that you own these assets free and clear. You don't, and we're cutting off your line of credit because they had a line of credit in addition to the loan. So that was the only way they would have gotten financing to even purchase AJ's. Had they gone in and said, because Jack Hendricks said, I'm going to prison. I don't own any of this free and clear. It's pledged as collateral. It's clear from the president's letter of the bank that they would not have gotten the loan to purchase this business. And regarding the income tax refund, the wages were made possible by him stealing the money through the fraud and getting the insurance proceeds and depositing it into their business bank accounts and then paying himself a wage. The victim should be able to get their wages, that money back from his wages. The district court was very careful in making sure that she got half of her wages and making sure that she received half of the retirement. I mean, it isn't as though the district court gave everything to the victims in this case. The judge was very careful to follow Wisconsin law and decipher what interest she had earned and accrued a legal and equitable interest in pursuant to the statutes. But the court did not clearly err in finding that the facts supported that on January 10th of 2014, appellant had not earned a legal equitable interest in that property. Appellant's counsel didn't address this today, just in passing, but I just want to mention it because it's in his brief. The appellant also received due process throughout these proceedings. The question from the very first briefing schedule we received was, what interest did appellant have in the assets? And so they had multiple chances throughout. She got to testify in a deposition. There was a resentencing hearing that they had made an appearance in and filed a pleading that they didn't appear on. Even in all of the briefing, they never make a showing like, hey, let me show you a chart of the clean money, and the clean money was plenty to sustain this business. If she had been able to make that showing, she would have, because she did present evidence when tools were owned by someone else, like her son or the manager of that A.J.'s business. She presented evidence to show, hey, they have a clean interest in this. They purchased these things themselves. Regarding her home, she presented evidence, which we didn't try to take, but she presented evidence when she needed to that said, hey, my dad gave me the down payment for this home. So where she's been able to show that she had a legitimate interest in something, she's received that from the district court. She can't complain just because of this narrow instance where the wages were paid for and the seed money for the business was from the fraud that she didn't get to process. Does the court have any further questions? Apparently not. Thank you. Thank you, Ms. Lurie. Mr. Goyke. May it please the court, this time we did ask for an evidentiary hearing very specifically when the judge entertained suggestions as to how the remand should be handled. We wanted to have that day in court to present things. In terms of presenting evidence, we incorporated the entire lengthy affidavit with each individual property item that A.J.'s owned as part of the record and where it came from. That was all before the district court, and none of that mattered. That's the evidence that we presented. Counsel says there was no credible evidence. We didn't have a chance to appear in front of the court and have her judge the credibility of what was out there. She talks about the letter from Butch Pomeroy, the president of the bank, when he terminated the line of credit that had been granted to A.J.'s. He would have been a good witness for us had we been able to cross-examine him. And even if what they say is correct, that this was all created because of fraud on these financial institutions, the $2 million that was owed to CoVantage that they didn't get full payment on, the International Bank of Amherst that advanced a loan that it otherwise would not have had it had full disclosure, they're the ones that would have the right to this constructive trust or some kind of an equitable claim to those assets. The burden seems to have been flipped because when we look at what January date in 2014, it would be the property interests of John and Catherine Henrichs as of that date. The property interests would have been the ownership of A.J.'s. Had there been a crime, there might have been a constructive trust for those other entities, but certainly not for the criminal restitution. They shouldn't be entitled to some kind of a constructive trust because by 2013, this thing had scaled down. He was no longer being the rampant criminal that he had been. He'd been caught. And he was earning W-2 wages from which a withholding was taken. He was earning them from what? Up until the date he was caught, he was getting a paycheck from Custom Collision, which was the business that was conducting the fraud. After he was caught, I think that was in June of 2013, he went working for a wage for A.J.'s after it opened, and Catherine Henrichs remained working for a third-party employer. What was the funding for A.J.'s? Initially— Was this more collateral put up that was already encumbered? There was some money from the International Bank, but A.J.'s also— When somebody loses a line of credit, is there any credit left available? No. Yeah, so that's zero. It's already gone. Initially, there was money to commence operations. In fact, A.J.'s paid Custom Collision's sales taxes that were unpaid at that time, so it put out way more than the government shows was being put in at its inception. In some, Your Honors, Wisconsin's a merit property state. Collections of debt can come from only the defendant's, the criminal defendant's, interest in property. If he had no interest in property, there's nothing to collect from. That would be the constructive trust because of any wrongdoing toward Covantage or from the International Bank of Amherst. And then Mrs. Henrichs is entitled to her undivided half because it's a merit property state. One more point, any claim of unjust enrichment is improperly made because she received her bankruptcy discharge and there was no objection to that discharge by the government in that case. Okay. All right. If there are no other questions? I guess not. Thank you. Thank you, Dorothy. Thank you, Ms. Lurie. Case is taken under advisement. Court will proceed to vote.